E. Benson Stanley *vs.* Jabez True.

Cumberland.    Opinion March 18, 1916.

*Action of Trover.    Belief of Parties as Bearing on Legal Construction of*
*Instrument.    Discharging of First Mortgage as Affecting*
*Second Mortgage.    Intervening Incumbrances.*

Action of trover for the wrongful conversion of a certain building known
as Glen Cottage, which had been moved by the plaintiff from the lot on
which it was built and was on its way across the adjoining land of the
defendant when the alleged conversion took place.    The premises in
question are a part of Ottawa Park in South Portland, which was sur-
veyed and plotted in the summer of 1899.

*Held:*

1. That the ownership of Glen Cottage, which is the point at issue, depends
upon the ownership of the lot from which it was removed.

2. That Glen Cottage was built in the Spring of 1900 upon that part of the
hotel lot as delineated on the recorded plan, which adjoined lot number
forty, the rear veranda possibly extending over and upon lot forty.

3. That on October 10, 1900, the Ottawa Park Company, the then owner,
mortgaged to the Mechanics Loan and Building Association lot forty and
the portion of the hotel lot on which Glen Cottage stood, which for con-
venience is called the addition.    This constituted a first mortgage on the
addition.

4. That on July 20, 1901, the Ottawa Park Company mortgaged to Reuben
and Henry B. Higgins the original hotel lot including the portion ad-
joining lot forty on which Glen Cottage stood.    This constituted a second
mortgage on the addition.

5. That on July 19, 1905, the Mechanics Loan and Building Association
mortgage was assigned to Isaac W. Hanson, who thereby held the first
mortgage on the addition, the Higgins mortgage still outstanding being a
second mortgage thereon.

6. That on December 27, 1905, Isaac W. Hanson discharged his mortgage
and on the same day took a new mortgage on the same property.

7. That by such discharge on the part of Hanson the Higgins mortgage
was ipso facto promoted from a second to a first mortgage on the addition,
and the new mortgage taken by Hanson became a second mortgage thereon.
When the prior mortgage was discharged no rights could be predicated
upon it nor deduced from it even though a new mortgage was given at
the same time.    Intervening incumbrances were thereby let in.            ,

8. That on March 30, 1910, the defendant became the assignee of the Higgins mortgage, foreclosed the same, the final decree of foreclosure being entered on February 13, 1913, and thereby secured title to the hotel lot including the addition and Glen Cottage standing thereon.

9. That the legal rights of the parties must be determined by the recorded conveyances and those conveyances place the legal title to Glen Cottage in the defendant.

Action of trover for conversion of a certain wooden building or cottage. Plea, general issue. Case reported to Law Court upon such evidence as competent and legally admissible; Law Court to render final judgment. Judgment for defendant.

Case stated in opinion.

*Hinckley & Hinckley,* for plaintiff.

*Frank H. Haskell, and Charles J. Nichols,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, KING, HALEY, HANSON, PHILBROOK, JJ.

CORNISH, J. This is an action of trover to recover the value of a certain building known as Glen Cottage which the plaintiff alleges the defendant wrongfully appropriated and converted to his own use on June 3, 1914. This cottage had been moved by the plaintiff from the lot on which it was built and was on its way across the adjoining land of the defendant when the alleged conversion took place. The ownership of the building is the point at issue, and that depends upon the ownership of the lot from which it was removed. Both parties claim title to this lot, the plaintiff by warranty deed from Charles B. Dalton, dated January 23, 1906, and by quit claim from the Ottawa Park Company of the same date; and the defendant under a foreclosed mortgage dated July 20, 1901. The storm centre is whether this mortgage covered and held the lot on which Glen Cottage stood.

The premises in question are a part of the Ottawa Park development at Cape Elizabeth which was promoted in 1899. An elaborate plan of streets and projected lots was made by a civil engineer, dated August 16, 1899, filed on November 22, 1899, and recorded in Cumberland Registry of Deeds, Plan Book 9, page 29. We are concerned with only a portion of this Park property, namely lot

forty and the large central lot known as the Cliff Cottage lot or hotel lot, which contained 56,553 square feet, and which was bounded by Cottage street on the southwest, and on all other sides by surrounding lots numbered from twenty-nine to forty-three inclusive. On this hotel lot stood Cliff Cottage, afterwards known as the Cliff House, a summer hotel. This was the only building that then existed and was the only one delineated on the plan filed November 22, 1899, except a cottage known as Sunnybank Cottage which stood on lot thirty and is not involved here.

It appears that because of certain changes made in Cottage Road in the spring of 1900, a second plan of the entire tract was made, dated May 28, 1900, filed on July 24, 1900, and recorded in plan book No. 9, page 39. In the early spring of 1900, after the filing of the first plan and before the filing of the second, Glen Cottage was built upon that portion of the hotel lot which adjoined lot forty. The rear veranda overhung lot forty. At that time Josephine L. Dalton was the owner of both lot forty and the hotel lot. The outlines of this cottage appear on the second plan, and a reduced copy of so much of that plan as is necessary to picture the locus and to aid in understanding the case follows:

Glen Cottage contained eleven numbered rooms, was connected with Cliff Cottage or the Cliff House by a flight of steps and also by electric light wires, water pipes, call bells, etc., and was used. for guests as a sort of annex to the hotel.

So much for the general situation. Let us now examine the title. Many deeds were introduced in evidence, but on careful analysis, few of them are found to affect the issue.

HOTEL LOT.

On August 21, 1899, Alpheus Hyatt, the then owner of the entire tract, by warranty deed conveyed the hotel lot as delineated on the first plan, to Charles B. Dalton, and on November 23, 1899, Dalton conveyed the same to Elmer P. Sargent. Sargent mortgaged it on the same day to the Deering Loan and Building Association for $3,000, and conveyed the equity by quitclaim deed to Josephine L. Dalton, the wife of Charles B. Dalton. Mrs. Dalton took up the Sargent mortgage of November 23, 1899, to the Deering Loan and Building Association on May 7, 1900, and on the same day gave a new mortgage to the same association for the sum of $5,000, which was discharged on January 22, 1902. The description in this mortgage refers to plan one and covers the entire hotel lot. Evidently at about this time Glen Cottage was erected, not on lot forty but on that portion of the hotel lot next to lot forty. Lot forty was then unencumbered and Mrs. Dalton was anxious to have the lot on which Glen Cottage had been built also free from encumbrance. She therefore procured on May 23, 1900, from the Deering Loan and Building Association, the mortgagee, a release of that portion of the hotel lot on which the cottage stood, the release reading: "a certain lot of land at Ottawa Park . . . adjoining the southeasterly side line of lot forty, meaning and intending to release so much of a certain lot that is now held by a certain mortgage for $5,000, held by the Deering Loan and Building Association as is occupied by a certain cottage and verandahs attached thereto, said cottage being situated on lot forty and premises hereby released." This release left Mrs. Dalton with the title to lot forty and the adjoining portion of the hotel lot, which we will call for the sake of brevity the addition, free from encumbrance, and with the title to the balance of the hotel lot subject to the Deering Loan and Build-

ing Association mortgage. The equity continued to be held not by several parties but by a single party.

On July 9, 1900, Mrs. Dalton conveyed all her equity in the entire Ottawa Park property to the Ottawa Park Company, and that company on July 20, 1901, executed a mortgage to Reuben and Henry B. Higgins, which covered the original hotel lot, including the addition, and under which the defendant claims title here. The description is as follows: "A certain lot or parcel of land . . . being a part of what has been called the Cliff Cottage property, now Ottawa Park, and is more fully described on the plan of said property . . . recorded in Cumberland Registry of Deeds, Plan Book 9, page 29, to which reference may be had for a more full and perfect description. Said lot is outlined on said plan as containing the building formerly called Cliff Cottage and has a frontage of one hundred and seventy (170) feet on said Cottage Road and is bounded on the northwest by lots indicated on said plan as numbers 39, 40, 41, 42 and 43, on the north and east by lots 34, 35, 36, 37 and 38, on the southeast by lots 29, 30, 31, 32 and 33; and having an area of fifty-six thousand five hundred and fifty-three (56,553) feet. Said property hereby conveyed is subject to a mortgage to the Deering Loan and Building Association dated May 7, 1900, and recorded in Cumberland Registry, etc." This Higgins mortgage was assigned to the defendant, Jabez True, on March 30, 1910, and was foreclosed by him, the final decree of foreclosure being entered on February 13, 1913.

There can be no doubt that this Higgins mortgage in clear and unambiguous terms covers the entire hotel lot including the addition on which Glen Cottage stood. True, it does not mention Glen Cottage, and does mention Cliff Cottage; but the bounds are clearly defined, and its boundary on the northwest at the crucial point, is the lot line of forty. No exception is made of the addition, and the special reference is to the first plan, which was made before Glen Cottage was built.

At this point it is best to pause for a moment in the consideration of the chain of title to the hotel lot and take up the chain in LOT FORTY.

On May 10, 1900, Alpheus Hyatt conveyed by warranty deed to Josephine L. Dalton, lot forty as delineated on plan number one. As we have already seen, Mrs. Dalton owned at this time the hotel lot, subject to the mortgage to the Deering Loan and Building Association of May 7, 1900, and after the erection of Glen Cottage, that Association had released to her from the mortgage so much of the hotel lot as Glen Cottage occupied. This was on May 22, 1900. On the same day Mrs. Dalton, then owning lot forty and the addition free of encumbrance, mortgaged both lots with the cottage thereon to Elmer P. Sargent for the sum of $500. This mortgage was discharged on October 6, 1900.

In the meantime, on July 9, 1900, Mrs. Dalton, as we have before stated, had conveyed all her equity in the entire Ottawa tract to the Ottawa Park Company, and on October 9, 1900, she again conveyed to the Ottawa Park Company by quitclaim deed with metes and bounds this addition, which was described in the deed as a tract of the same width as lot forty, namely, about sixty-six and two-tenths feet, and projecting southeasterly into the hotel lot a distance of forty feet, "Meaning and intending hereby to convey all the rights released to me by deed of the Deering Loan and Building Association dated September 29, 1900 . . ." This last date is evidently erroneous. It should be May 22, 1900. This quitclaim deed was merely confirmatory of Mrs. Dalton's deed of July 9, 1900, to the same grantee, because under the prior deed she had conveyed all her right, title and interest in the entire tract.

The Ottawa Park Company on October 10, 1900, mortgaged to the Mechanic's Loan and Building Association for the sum of $1500 the same property embraced in the Sargent mortgage, that is, lot forty, the addition and Glen Cottage, the Sargent mortgage having been discharged four days before, on October 6, 1900.

The situation therefore on July 20, 1901, after the Ottawa Park Company executed the $10,000 mortgage to R. and H. B. Higgins on the hotel lot was this. The Ottawa Park Company owned lot forty, the addition, and Glen Cottage subject to the Mechanic's Loan and Building Association mortgage of October 10, 1900; and with the addition also covered by the Higgins mortgage of July 20, 1901, which as to that portion was therefore a second mort-

gage. It owned the remainder of the hotel lot subject, first, to the Deering Loan and Building Association mortgage of May 7, 1900, and, second, to the Higgins mortgage of July 20, 1901. The Deering Loan and Building Association mortgage was discharged a few months later, on January 22, 1902, and that left the Higgins mortgage a first mortgage on the hotel lot, exclusive of the addition, and a second mortgage on the addition, the Mechanic's Loan and Building Association mortgage being the first.

The next steps that were taken are important as they constitute the key to the legal rights of the parties in this action. The Mechanic's mortgage was assigned to Isaac W. Hanson on July 19, 1905, and by him discharged on December 27, 1905, he taking a new mortgage on the same day and on the same property from Charles B. Dalton, who at that time claimed to be the owner of the equity, although the conveyance of title from the Ottawa Company to him is not clear. The evidence contains a deed from the Ottawa Park Company to Davis and Wilson dated October 18, 1902, but none from them to Dalton. Assuming, however, Dalton's title to the equity to be perfect, the pivotal fact is that when the Mechanic's mortgage on lot forty and the addition and Glen Cottage was discharged, the Higgins mortgage, which was a second mortgage on the addition and Glen Cottage, was ipso facto promoted to a first mortgage on that portion. It became at once the underlying mortgage, and from that time forward continued as such. It was never discharged. The mortgage which Hanson took in place of the old and prior security could hold as an encumbrance only from its date, December 27, 1905, because when a prior mortgage is discharged no rights can be predicated upon it, nor deduced from it, even though a new mortgage is given at the same time. Intervening encumbrances are thereby let in. *Stearns* v. *Godfrey,* 16 Maine, 158, 162. In other words, by the discharge of the old mortgage and the taking of a new, the situation of the parties was reversed, and instead of Hanson holding the first mortgage on the addition and Higgins the second, the Higgins mortgage became the first, and the Hanson new mortgage became the second. This addition, therefore, with its cottage, because of the discharge of the prior Hanson mortgage, took its place under the Higgins mortgage alongside of the rest of the hotel lot. When the Higgins mortgage

was assigned to the defendant, Jabez True, and was foreclosed by him, the title to the addition and to Glen Cottage became as perfect in True as did the title to the rest of the hotel lot and to the Cliff House, which title the plaintiff does not question.

The deeds of the equity under which the plaintiff claims are two, a warranty from Charles B. Dalton and a quitclaim from the Ottawa Park Company, both dated January 23, 1906. The Dalton deed conveys subject to the Higgins mortgage of July 20, 1901, on the hotel lot, and to the Hanson mortgage of January 1, 1906, an error for December 27, 1905, on lot forty. The grant describes the buildings as "the Cliff House proper on what is known as the hotel lot" and "Glen Cottage on lot forty and the hotel lot." It may be that the parties to this deed supposed that the addition was free from the Higgins mortgage, but it was not, and their mistake could not affect the legal rights of the holder of the Higgins mortgage.

The plaintiff urges that the mortgagees of the respective parcels had the same belief. There is evidence tending to support that view, as for instance the fact that the insurance taken out on the Cliff House was made payable, in case of loss, to the Higgins as mortgagees or their assignee, and on Glen Cottage was made payable to Hanson as mortgagee. Other facts tend in the same direction. On the other hand Mr. Higgins testifies that Mr. Dalton came to him and asked him to release from his mortgage the lot that Glen Cottage stood on and he declined to do so. But the acts of the parties are of little weight here. The practical construction given to an instrument by the parties, is sometimes helpful in cases of doubt, but it cannot be permitted to throw down language which is in itself definite and certain, nor to violate well settled rules of construction. *Oakland Woolen Co.* v. *Union Gas & Electric Co.,* 101 Maine, 198.

No ambiguity exists here. The skein is somewhat tangled, but when unraveled the separate threads are distinct and each is definite and precise. The recorded conveyances must determine the legal rights of the parties, and those conveyances place the legal title to Glen Cottage and the land on which it stood in the defendant.

The entry must therefore be,

*Judgment for defendant.*